*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRANQUELL SAYMAN-ANTHONY BATES,

        Defendant-Appellant.

UNPUBLISHED
August 25, 2022

Nos. 355125; 355126
Ingham Circuit Court
LC Nos. 19-000528-FC;
           19-000049-FH

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

PER CURIAM.

This case consists of two consolidated appeals.[1] In Docket No. 355125, defendant appeals as of right his jury trial convictions of assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[2] Defendant was sentenced, as a second-offense habitual offender, MCL 769.10, to 5 to 15 years' imprisonment for his AWIGBH conviction and to two years' imprisonment for his felony-firearm conviction. In Docket No. 355126, defendant appeals as of right his jury trial convictions for carrying a concealed weapon (CCW) in a vehicle occupied by defendant, MCL 750.227(2), felon in possession of a firearm (felon-in-possession), MCL 750.224f, and felony-firearm. Defendant was sentenced, as a second-offense habitual offender, MCL 769.10, to 24 to 90 months' imprisonment for his CCW conviction, 24 to 90 months' imprisonment for his felon-in-possession conviction, and two years' imprisonment for his felony-firearm conviction. We vacate defendant's sentence for AWIGBH and remand for resentencing for that sentence; in all other respects, we affirm.

---

[1] *People v Bates*, unpublished order of the Court of Appeals, entered November 16, 2020 (Docket Nos. 355125 and 355126).

[2] Defendant was acquitted of assault with intent to murder (AWIM), MCL 750.83, discharging a weapon from a vehicle, MCL 750.234a(1)(a), and a count of felony-firearm.

# I. FACTUAL BACKGROUND

This case arises from a shooting that took place outside of a Speedway gas station. Around midnight on December 25, 2018, the victim, Mark Studier, was driving to the Speedway to cash lottery tickets. While switching lanes, Studier testified that he "almost sideswiped or came too close" to a car in which defendant was a passenger. Studier pulled into Speedway and parked next to a pump. The car in which defendant was riding as a passenger followed Studier into the lot, parking at the pump behind Studier. The two exited their cars, and, according to Studier, defendant told Studier that Studier had cut him off. Defendant followed Studier into the Speedway, and the two continued to argue.

According to Ronald Howe, the cashier clerk for Speedway, Studier said to defendant, "What are you going to do, what are you going to do? Are you going to shoot? Are you going to shoot?" Howe testified that defendant responded, "What did you say?" In response, Studier again asked defendant if defendant was "going to shoot." Defendant replied, "You want me to? You want me to?" Studier replied, "I don't see no gun in your waistband." Defendant said, "I got you," and he walked out of the store without buying anything. Studier testified that, during this exchange, defendant "lifted up his shirt toward" Studier, which Studier interpreted to mean that defendant had a gun. Howe could not recall defendant lifting his shirt and could not recall seeing a weapon in defendant's possession.

After defendant left the Speedway store, Studier finished cashing his lottery tickets and walked back to his car. As Studier was pulling out of Speedway, he "heard some gunshots" from behind him. Studier accelerated, turning left at an intersection. He heard a second gunshot. Studier indicated that this gunshot pierced his back window and struck directly behind his driver's seat. After ensuring he was a safe distance away and that no one was following him, Studier called 911.

Following the shooting, Michigan State Trooper Andrew Adamczyk was assigned as the officer in charge to investigate the incident. Adamczyk received a copy of Speedway's security camera footage from the early morning hours of December 25, 2018. Adamczyk created still images from the footage, which included images of both the suspect and the car in which he was a passenger. Adamczyk compiled these images into an "I-[B]ulletin"[3] and disseminated it to Michigan State Police's partnered agencies.

Officer Paige Hartman of the Michigan State University Police and Officer Wesley Vaughn of the Lansing Police Department both recognized the images of defendant. Officer Vaughn knew that defendant had "some type of relationship with" a person named Tristan Harwell, who drove the same kind of car depicted in the I-Bulletin. On December 27, 2018, Officer Vaughn drove to Harwell's apartment to look for the car, a silver Chevrolet Cruze. He found the vehicle, and he also observed defendant getting into a black Chevrolet Impala with a person named Jecinda Reid.

---

[3] Trooper Adamczyk explained that an I-Bulletin is something police use and send out to other law enforcement agencies and the public to request their assistance in identifying people.

Officer David Stolzfus surveilled defendant and Reid in plain clothes and an unmarked car as they ran errands. Eventually, Officer Robert Forbis, who was wearing a uniform and driving a marked patrol car performed a traffic stop, accompanied by Michigan State Trooper Benjamin Breslin. Because defendant had outstanding arrest warrants, defendant was arrested. During the traffic stop, Reid told the officers that defendant had seen the marked patrol car and had advised Reid to drive carefully. Reid also informed the officers that defendant had pulled out a gun, placed it in a bag, and placed the bag in the back seat.

In light of Reid's statements, Trooper Breslin searched the Impala and found a handgun inside of a bag located in the backseat. Subsequently, Trooper Adamczyk seized defendant's phone, obtained a search warrant to search its contents, and discovered four pictures of defendant wearing a sweatshirt that appeared identical to a sweatshirt worn by the suspect seen on the Speedway security camera. Carissa Horan, a firearms examiner for the Michigan State Police, determined that the handgun recovered from Reid's Impala had fired a bullet recovered from Studier's car.

Defendant was initially charged with CCW, felon-in-possession, and felony-firearm for being in possession of the handgun found in the Impala. In a separate lower court file, defendant was subsequently also charged with assault with intent to murder, MCL 750.83 (AWIM), discharging a weapon from a vehicle, and two counts of felony-firearm for the December 25, 2018 shooting. All of defendant's charges were tried together at a three-day jury trial. The jury found defendant not guilty of discharging a weapon from a vehicle and the associated felony-firearm count. The jury found defendant guilty of AWIGBH, the lesser-included offense of assault with intent to murder (AWIM), and its associated count of felony-firearm; and it found defendant guilty of CCW, felon-in-possession, and the associated count of felony-firearm. Defendant was sentenced as described above, and he appeals from his convictions and sentences.

## II. CLAIMS OF EVIDENTIARY ERROR

Defendant first argues that the trial court erred in admitting testimony from three police officers identifying him as the person depicted on the Speedway surveillance video, and the trial court also erred in admitting another police officer's testimony that Reid told the officer about defendant putting the gun in a bag in the back seat of the Impala. We agree that some of the identification testimony was improper, but we do not find the errors to have affected the outcome of the proceedings.

### A. STANDARD OF REVIEW

The decision whether to admit evidence is within the discretion of the trial court, and this Court will not disturb that decision absent an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). A decision on a close evidentiary question will generally not be an abuse of discretion. *People v Blackston*, 481 Mich 451, 467; 751 NW2d 408 (2008). This Court reviews preliminary legal determinations of admissibility de novo, and it is necessarily an abuse of discretion to admit legally inadmissible evidence. *Gursky*, 486 Mich at 606. An evidentiary error will not warrant relief "unless refusal [to grant relief] appears to the [reviewing] court inconsistent with substantial

justice." MCR 2.613(A). "If the court's evidentiary error is nonconstitutional and preserved, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (internal quotation marks and citations omitted). "[T]he effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

An unpreserved evidentiary challenge is subject to plain-error review. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). Under plain-error review, the defendant must establish the following: (1) an error occurred; (2) that error was plain; and (3) that error affected the defendant's substantial rights. *Id*. at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. If the defendant successfully carries this burden, this Court should reverse if "the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error 'seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.' " *Id*. at 763-764, quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (quotations marks and citation omitted). Defendant did not object to the admission of the identification testimony, but he did object to the admission of the police officer's testimony about what he had been told by Reid.

## B. IDENTIFICATION TESTIMONY

During their testimony, Trooper Andrew Adamczyk, Officer Paige Hartman, and Officer Wesley Vaughn provided testimony regarding the person depicted in Speedway security camera footage. Defendant argues that their testimonies were impermissible identification testimony that invaded the province of the jury as factfinder. We agree in part.

Trooper Adamczyk testified that the person in the Speedway security camera footage appeared to be wearing a sweatshirt identical to the sweatshirt defendant was wearing in a photograph of defendant from defendant's phone:

> *Q*. Having viewed the video from Speedway, were you able to see the type of shirt [defendant] was wearing inside the Speedway?
>
> *A*. I could tell that it was a white long-sleeved sweatshirt of some sort, with a type of lettering across the front, with some kind of logo or emblem underneath the lettering.
>
> *Q*. . . . then what you saw in the video, how does that compare to People's 11 here, the photo that we see here from the—of the [d]efendant?
>
> *A*. Very similar.
>
> *Q*. Did you see any differences between the two?
>
> *A*. No sir.

Officer Vaughn testified that he identified defendant as the person depicted in still images taken from Speedway security camera footage:

> *Q*. Now, when you viewed the I-[B]ulletin, did you view it on a piece of paper or as an attachment to an e-mail?
>
> *A*. I believe the first time I saw it was a—it was an attachment to a departmental e-mail.
>
> *Q*. When you saw the person depicted in there, did you recognize that person?
>
> *A*. Yes, I did.
>
> *Q*. Who did you recognize that person was?
>
> *A*. [Defendant].
>
> *Q*. Was that identification based on your prior investigation in his Facebook and other methods?
>
> *A*. Yes, it was.

Officer Hartman also testified that she identified defendant as the person depicted in still images taken from the Speedway security camera footage:

> *Q*. Now, I want to direct your attention to approximately December 25th of 2018. Did you observe the I-Bulletin that was put out by Trooper Adamczyk in this case?
>
> *A*. I did.
>
> *Q*. When you saw that I-Bulletin, did you recognize someone in the photo?
>
> *A*. I did.
>
> *Q*. And who was that?
>
> *A*. [Defendant]
>
> *Q*. And is that because of your contact with him previously?
>
> *A*. It was.

Generally, whether a defendant is an individual depicted in a photograph or video should be left to the jury to decide. *People v Fomby*, 300 Mich App 46, 52-53; 831 NW2d 887 (2013). However, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704. In relevant part, such opinion evidence is "otherwise admissible" if it is rationally based on the

witness's perceptions and helpful to the jury's understanding or determination of a fact at issue. MRE 701. In evaluating whether identification testimony by a witness is admissible, the critical analysis is whether the witness is more likely to make a correct identification than the jury would be if unassisted. *Fomby*, 300 Mich App at 52-53. In *United States v Dixon*, 413 F3d 540, 545 (CA 6, 2005), the Sixth Circuit Court of Appeals provided some factors that may be relevant to this inquiry:[4]

> (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or when the defendant was dressed in a manner similar to the individual depicted in the photograph; (3) whether the defendant had disguised his appearance at the time of the offense; [] (4) whether the defendant had altered his appearance prior to trial[;] . . . [and] [5] the degree of clarity of the surveillance photograph and the quality and completeness with which the subject is depicted in the photograph. [Citations omitted.]

"[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980)

Initially, we disagree with defendant's contention that Trooper Adamczyk offered improper identification testimony. Trooper Adamczyk did not testify that the individual depicted in the Speedway security camera footage was defendant. He only testified that the sweatshirt worn by defendant in a photograph seized from his phone appeared to be "very similar" to the sweatshirt worn by the suspect shown in the Speedway security camera footage. In *Fomby*, a police officer offered testimony that individuals depicted in a surveillance video were the same individuals depicted in photographs, which this Court held did not constitute an opinion as to whether the defendant was one of those individuals. *Fomby*, 300 Mich App at 53. Here, Trooper Adamczyk did not even go that far: he did not testify that the person in the surveillance video was the person depicted in the photo seized from defendant's phone, but rather only noted that both individuals were wearing identical sweatshirts. Trooper Adamczyk expressed no opinion about whether defendant was the person in the video.

There was reason to believe that Officer Vaughn was more likely than the jury to correctly identify defendant from the Speedway security camera footage. Less than a year before the December 25, 2018 shooting, Officer Vaughn spent three to four months studying pictures of defendant from defendant's social media accounts, in addition to defendant's previous booking photographs and driver's license photographs. Officer Vaughn testified that he looked at these pictures of defendant "almost on a daily basis" during this three-to-four-month period. From this, it is reasonable to conclude that Officer Vaughn had a higher level of familiarity with defendant's appearance, and especially defendant's appearance in photographs and electronic media, than the

---

[4] "Lower federal court decisions are not binding on this Court, but may be considered on the basis of their persuasive analysis." *Fomby*, 300 Mich App at 50 n 1. We believe *Dixon* offers persuasive value considering that "MRE 701 is virtually identical to FRE 701." *Fomby*, 300 Mich App at 50.

jury. Given Officer Vaughn's significantly higher level of familiarity, and given that the Speedway security camera footage was unclear and somewhat grainy, it is reasonable to conclude that Officer Vaughn would have been more likely to correctly identify defendant from the footage than would the jury. Accordingly, the trial court did not plainly err by admitting Officer Vaughn's testimony identifying defendant in the Speedway security camera footage.

Conversely, the trial court did plainly err by admitting Officer Hartman's identification testimony. Officer Hartman testified that she had spent five to six hours in defendant's physical presence on one occasion in 2016. However, the jury also spent at least five or more hours in defendant's physical presence: the first day of defendant's trial ran from 9:13 a.m. until 2:31 p.m. Moreover, there is nothing in the record suggesting that defendant had altered his appearance since the shooting, and the jury would have the added advantage of being able to see defendant and compare him to the surveillance footage in real time. In short, there is nothing in the record suggesting that Officer Hartman was more likely to correctly identify defendant from the Speedway security camera footage than the jury.

Despite this error, we are not persuaded that Officer Hartman's identification testimony had any effect on the jury's verdict. Importantly, Officer Vaughn's identification testimony was admissible, as was Trooper Adamczyk's observation that the person in the video wore a sweatshirt identical to a sweatshirt worn by defendant. Furthermore, both Studier and Howe also identified defendant as the person in the Speedway with whom Studier was arguing on December 25, 2018. Officer Hartman's identification of defendant was therefore largely cumulative. Additionally, ample other evidence tended to show that defendant was the person who shot at Studier. Officer Vaughn testified that defendant had a relationship with Tristan Harwell, a woman who lived at an apartment less than a mile to the West of the Speedway and who drove a car matching the one depicted in the Speedway security camera footage. According to Reid, defendant was living at Harwell's apartment at the time. Finally, Reid testified that defendant put a handgun in a bag in the back seat of her car, and Horan testified that the bullet Officer Dean found in Studier's car was fired from that handgun. When considering the entire record and the context of the untainted evidence, we find no likelihood that a different outcome would have resulted if Officer Hartman's identification testimony had not been admitted. *Lukity*, 460 Mich at 495-496. Reversal is therefore not warranted.

## C. OTHER-ACTS EVIDENCE

Defendant next argues that the trial court plainly erred by allowing Officer Vaughn and Officer Hartman to testify about their prior contacts with defendant. Defendant argues that their testimonies constituted impermissible and prejudicial character evidence. We disagree.

At trial, Officer Vaughn testified that he had investigated defendant previously in 2018. He testified:

> *Q*. All right. [Officer Vaughn], without describing the details of your investigation, were you investigating [defendant] earlier in 2018 for another, I will call it, incident?
>
> *A*. Yes, I was.

*Q*. And could you please tell us what steps you took to investigate [defendant] earlier in 2018?

*A*. During the summer I spent the course of three or four months studying photos of [defendant] to include his social media accounts, previous booking photos, driver's license photos. I monitored his social media on a daily basis for the purpose of being able to figure out where he was and identified him when I finally saw him in person.

*Q*. You talked about social medial accounts. In particular, do you remember what accounts you were checking on?

*A*. Primarily his Facebook account with the—at the time it had the name Branquell (inaudible).

*Q*. Any other things like Twitter, Snapchat, any other ones?

*A*. There was a little bit of Snapchat. But primarily Facebook in regard to social media.

*Q*. And during that investigation, were you able to see photos of [defendant]?

Officer Vaughn testified that, as a part of his investigation, he was looking at photographs of defendant "almost on a daily basis for three to four months." Like Officer Vaughn, Officer Hartman testified that she had prior contact with defendant:

*Q*. Now, I want to direct your attention to, I believe 2016. Did you have any contact with the [d]efendant that year, Branquell Bates?

*A*. I did.

*Q*. If you could, was that contact on one day, more than one day?

*A*. One day.

*Q*. All right. Can you tell us approximately how much time you spent with him that day?

*A*. That day, approximately five or six hours.

*Q*. All right. And when I say spent with him, like in physical presence of him?

*A*. Correct.

*Q*. Where you could observe him?

*A.* Correct.

*Q.* Did you, that day, become familiar with his face?

*A.* I did.

In general, evidence of a person's character, which may include evidence of other crimes or other prior conduct, is inadmissible to show that the person acted in conformity with that character. *People v Starr*, 457 Mich 490, 494-495; 577 NW2d 673 (1998). Testimony may impermissibly reference an "other act" by implication, even if the conduct is not explicitly stated. See *People v Jackson*, 498 Mich 246, 264; 869 NW2d 253 (2015). However, such "other acts" are admissible pursuant to MRE 404(b), which is "a rule of inclusion," for any other purpose "that does not risk impermissible inferences of character to conduct." *Starr*, 457 Mich at 496. The evidence must also be relevant under MRE 401, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice under MRE 403, and the trial court may give the jury a limiting instruction upon request. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993). "Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character" and "is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (emphasis in original).

Neither officer described any particular prior conduct by defendant. Officer Hartman never even explained why she had prior contact with defendant, although it is reasonably inferable that her prior contact with defendant was probably pursuant to a police investigation. As noted, prior conduct may be indicated by implication. *Jackson*, 498 Mich at 264. However, in *Jackson*, the complained-of testimony clearly implied that the defendant, who was charged with sexually abusing a 12- to 13-year-old member of his church, had previously sexually abused the witness when the witness was a young member of the church. *Id*. at 250-255, 264-265. In other words, the testimony clearly indicated specific prior conduct, and it was introduced for the purpose of showing that the defendant engaged in similar conduct by committing the charged offense. In contrast, here we find it doubtful that the officers' vague descriptions of defendant's involvement in unspecified investigations, with no stated outcome of those investigations, rises to the level of describing "other acts" that could show any character or propensity by defendant.

Nevertheless, even presuming the officers' testimony *could* show character or propensity, it was unambiguously offered for a proper noncharacter purpose. Specifically, Officer Vaughn and Officer Hartman testified about their prior contacts with defendant for the purpose of explaining why they were able to recognize defendant from the surveillance video. MRE 404(b) explicitly includes "proof of . . . identity" as one of the non-exclusive enumerated purposes for which other-acts evidence may be admitted. Even if the officers' testimony constituted other-acts evidence, it was introduced for a proper noncharacter purpose.

" 'Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The identity of the person in the Speedway surveillance video was a fact of consequence because the person's identity would tend to establish (or potentially disprove) whether defendant shot at Studier. The officers' abilities to make an

accurate identification from the surveillance video was relevant to that identification, and the testimony about why the officers were familiar with defendant was relevant to their ability to make an accurate identification. The officers' testimonies were therefore relevant under MRE 401.[5]

Finally, under MRE 403, a trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

> Assessing probative value against prejudicial effect requires a balancing of several factors, including the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*Blackston*, 481 Mich at 462.]

As noted, unlike the testimony in *Jackson*, the officers here never described any specific conduct by defendant. Although their testimony suggested that defendant had been the subject of police investigations, the outcome of those investigations was not disclosed. Furthermore, the jury was already concretely aware that defendant had a criminal history, because Trooper Breslin testified that he arrested defendant because defendant had multiple outstanding arrest warrants. Therefore, Officer Vaughn's and Officer Hartman's testimonies about their prior contacts with defendant told the jury little, if anything, about defendant's prior conduct that the jury did not already know. The prejudicial effect of their testimony was therefore modest.

Conversely, identifying the person in the surveillance video was of great significance to the case. As is evident from our discussion above, it was also important to establish with some detail why the officers could (or could not) make a more accurate identification than the jury could make without assistance. It was therefore unavoidable that the officers would need to provide far more than a mere conclusory statement that they were familiar with defendant. Without the additional details provided by Officer Vaughn, it might not have been possible to determine that he could make a better identification. The probative value of Officer Vaughn's testimony was not significantly outweighed by a danger of undue prejudice. Although the probative value of Officer Hartman's testimony is somewhat mitigated by our conclusion that her identification was inadmissible, Officer Hartman's description of her prior contact with defendant was also

---

[5] Although Officer Hartman's identification of defendant was ultimately inadmissible, the fact that her familiarity with defendant was insufficient does not mean her explanation of that familiarity was irrelevant, because her explanation still made it more likely that she could accurately identify defendant in court. In other words, the admissibility of her identification turned on whether she was in a relatively better position than the jury to make that identification, not on whether she was adequately capable of making the identification in the abstract.

significantly vaguer than was Officer Vaughn's description. We therefore conclude that Officer Hartman's testimony was also not significantly outweighed by a danger of undue prejudice.

## D.  INEFFECTIVE ASSISTANCE OF COUNSEL

In the alternative, defendant argues that his trial counsel was ineffective for failing to object to the admission of Officer Hartman's, Officer Vaughn's, and Trooper Adamczyk's identification testimony, Officer Hartman's testimony about her prior contact with defendant, and Officer Vaughn's other-acts testimony. We disagree. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (citation omitted). Because the only erroneously admitted evidence was Officer Hartman's identification testimony, counsel cannot have been ineffective for failing to object to any of the other testimony. Furthermore, even if counsel's performance was deficient,[6] a defendant claiming ineffective assistance of counsel must show "a reasonable probability" that counsel's errors affected the outcome of the proceeding. *People v Pickens*, 446 Mich 298, 314-315; 521 NW2d 797 (1994). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v Richter*, 562 US 86, 111-112; 131 S Ct 770; 178 L Ed 2d 624 (2011). Because we have already determined that the evidentiary error did not affect the outcome of the proceedings, defendant is not entitled to relief regarding his claim he received ineffective assistance of counsel.

## E.  REID'S OUT-OF-COURT STATEMENT

Defendant also argues that the trial court improperly permitted hearsay testimony from Trooper Benjamin Breslin about what Reid told him during the traffic stop of Reid's Impala, following which defendant was arrested. We disagree. Trooper Breslin testified as follows:

> *Q*.  What was your function at that point once the defendant was removed from the car, what were you responsible for?
>
> *A*.  At that point basically the remains of the traffic stop, speaking with the driver, misread [*sic*[7]]. And shortly after we got [defendant] out of the car. The driver told us that there was a gun in the car. And that [defendant] said that he saw us as we were.

Defendant objected on grounds of hearsay, following which the prosecution explained, "I'm not asking for the truth of the matter asserted. Just to show why the officers did what they did." On the basis of this explanation, the trial court overruled defendant's objection. The prosecution then continued its line of questioning:

---

[6] We express no opinion whether trial counsel's performance was deficient, because doing so is unnecessary to resolve this issue on appeal.

[7] We presume this was a transcription error and "misread" was originally "Miss Reid."

*Q*. Were you present—did you or another officer speak to the driver Jecinda Reid?

*A*. Yes.

*Q*. Which?

*A*. So I spoke with her briefly to begin with. She made a statement to Officer for Business [*sic*[8]] and spoke with Trooper Ramy.

*Q*. Were you present to overhear her statement to Officers For Business? [*sic*]

*A*. I believe so. Yes.

*Q*. All right. And the statement, what was in the car?

*A*. There was a gun in the car.

*Q*. And did she say how it got there?

*A*. Yes.

*Q*. What was that?

*A*. She said that she said that [defendant] saw our patrol cars as we were making our approach. He told her drive careful so we don't get pulled over. Then she went on to actually show basically motioning how he pulled the gun out, reached in the back seat, grabbed her bag. Put the gun in the bag and then through [*sic*] it back in the back seat.

*Q*. I understand. Based on her statement, do you—did you or other officers search the car then?

*A*. Yes.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Neither party disputes that Trooper Breslin testified about an out-of-court statement that Reid made. The parties dispute whether the prosecution offered her out-of-court-statements to prove the truth of the matter asserted.

Typically, a statement offered to show the effect of an out-of-court statement on the hearer is not one offered to prove the truth of the matter asserted. *People v Gaines*, 306 Mich App 289,

---

[8] We presume this was a transcription error and "Officer For Business" was originally "Officer Forbis."

306-307; 856 NW2d 222 (2014). "Such statements are not offered for a hearsay purpose because their value does not depend upon the truth of the statements." *Id*. at 307 (internal quotation marks, brackets, and citation omitted). "Specifically, a statement offered to show why police officers acted as they did is not hearsay." *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007) (citation omitted). It is clear from the prosecutor's statements and from the context of Trooper Breslin's testimony that the evidence was admitted to explain why the arresting police searched the bag in the back seat of Reid's Impala, in which they found a handgun.

Defendant argues that the testimony was nevertheless inadmissible because the prosecutor did not explain precisely what police conduct the testimony would explain before introducing the testimony. However, defendant relies on a misapprehension of the applicable case law. Defendant correctly observes that our Supreme Court has "rejected the notion that a rote recitation that a statement is not offered for the truth of the matter asserted is sufficient to admit an out-of-court statement." *People v Musser*, 494 Mich 337, 359; 835 NW2d 319 (2013). However, *Musser* did not hold that a detailed explanation necessarily must precede an out-of-court statement. Rather, *Musser* only reiterated the unremarkable principle that *merely saying* a statement is being offered for a proper purpose does not, by itself, *establish* that it *is* being offered for a proper purpose. In other words, although a trial court might err by uncritically accepting a conclusory statement at face value, *Musser* did not mandate a particular sequence that the trial court must follow. Here, the purpose of Trooper Breslin's testimony about Reid's out-of-court statement would have been reasonably apparent from the outset, and the prosecution ultimately confirmed that purpose. Defendant would elevate form over substance in a manner not required by any authority.

Defendant also argues that Trooper Breslin's testimony about Reid's out-of-court statement should not have been admitted because the jury did not need to know why the police searched the car, and, in any event, it would have sufficed to say that Reid cautioned the police that a gun was present. Defendant did not preserve an objection on that basis in the trial court, so this argument is reviewed only for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764. Relevant evidence may be excluded if its probative value is substantially outweighed by, *inter alia*, "needless presentation of cumulative evidence" pursuant to MRE 403. Because Reid also testified at trial, and she testified that defendant hid a handgun in her bag and put the bag in the back seat while the police were pulling her over, Trooper Breslin's testimony was arguably needlessly cumulative. However, Reid's testimony also makes it extremely unlikely that Trooper Breslin's testimony about Reid's statement affected the outcome of the proceedings. Trooper Breslin's testimony may have bolstered Reid's testimony slightly, but Reid's testimony was much more significantly corroborated by Officer David Stolzfus's testimony. Officer Stolzfus testified that, while Officer Robert Forbis was pulling Reid over, Officer Stolzfus saw defendant reach behind the driver seat and then sit back up. Even if Trooper Breslin's testimony about Reid's out-of-court statement was erroneous, it did not affect the outcome of the proceedings. *Carines*, 460 Mich at 763-764.

## III. SCORING OF OFFENSE VARIABLE 12

At defendant's sentencing hearing, the trial court concluded that defendant's total Offense Variable (OV) score was 35 points, putting him at OV Level IV, and that defendant's total Prior Record Variable (PRV) Score was 55 points, putting him at PRV Level E. This produced a guidelines minimum sentence range of 29 to 71 months' imprisonment for AWIGBH. The trial

court sentenced defendant within this range, to a minimum of 60 months' imprisonment. On appeal, defendant argues that the trial court clearly erred by assessing five points for OV 12. We agree.

OV 12 is scored for "contemporaneous felonious criminal acts." MCL 777.42(1). An act is "contemporaneous" if it "occurred within 24 hours of the sentencing offense" and "has not and will not result in a separate conviction." MCL 777.42(2)(a)(*i*) and (*ii*). A trial court should assess five points for OV 12 when the defendant committed "[o]ne contemporaneous felonious criminal act involving crimes against a person," MCL 777.42(1)(d), or when the defendant committed "[t]wo cotemporaneous felonious criminal acts involving other crimes." MCL 777.42(1)(e). The "sentencing offense" for purposes of scoring OVs is "the crime of which the defendant has been convicted and for which he or she is being sentenced." *People v Carter*, 503 Mich 221, 227; 931 NW2d 566 (2019) (quotation marks and citation omitted). When assessing points for OV 12, the trial court "must look beyond the sentencing offense and consider only those separate acts or behavior that did not establish the sentencing offense." *People v Light*, 290 Mich App 717, 723; 803 NW2d 720 (2010).

In this case, defendant committed no contemporaneous felonious criminal acts for which the trial court could have assessed points under OV 12. Pursuant to MCL 777.42(2)(b), defendant's felony-firearm violations may not be considered in scoring OV 12. Defendant's convictions for CCW and felon-in-possession were not "contemporaneous" because they occurred more than 24 hours after the sentencing offense, MCL 777.42(2)(a)(*i*), and they resulted in separate convictions, MCL 777.42(2)(a)(*ii*). Finally, because defendant was acquitted of AWIM and of discharging a weapon from a vehicle, the trial court was not permitted to consider those offenses when crafting defendant's sentence. *People v Beck*, 504 Mich 605, 626-627; 939 NW2d 213 (2019). Finally, there is nothing else in the record indicating that defendant committed any other cotemporaneous felonious conduct. It follows that the trial court clearly erred by assessing five points for OV 12.

Deducting five points from defendant's total OV score would reduce his total OV score to 30 points, reducing him from OV Level IV to OV Level III. MCL 777.65; MCL 777.21(3)(a). At OV Level III, defendant's guidelines minimum sentence range would have been 19 to 47 months' imprisonment. MCL 777.65. As a result, defendant's minimum sentence of 60 months is outside defendant's correct guidelines minimum sentence range. We therefore vacate defendant's sentence for AWIGBH and remand for resentencing. *People v Kimble*, 470 Mich 305, 312-313; 684 NW2d 669 (2004); *People v Francisco*, 474 Mich 82, 90-91; 711 NW2d 44 (2006).

IV.  SENTENCING CREDIT

Finally, defendant argues that the trial court deprived him of due process by failing to credit him 643 days, instead of 504 days, against his AWIGBH sentence. We disagree.

At defendant's sentencing hearing, defendant sought additional sentencing credit towards his AWIGBH sentence. At sentencing, defendant noted that in lower court file 19-000528-FC (the file for defendant's charges from the December 25, 2018 shooting), the Department of Corrections had recommended defendant be given 504 days of sentencing credit. In lower court file 19-000049-FC (the file for defendant's charges from the December 27, 2018 traffic stop), the

-14-

Department of Corrections had recommended that defendant be given 643 days of sentencing credit. Defendant asked the trial court to give defendant 643 days of sentencing credit in both files. The trial court declined, because the 139-day difference in sentencing credit was due to the charges in 19-000528-FC being filed 139 days after the charges in 19-000049-FC were filed, and "I don't see how I can give him credit for time for a case that wasn't in existence." The trial court did give defendant credit for 504 days.

Whether defendant is entitled to credit for time served in jail between the time of his arrest and sentencing presents a question of law that this Court reviews de novo. See *People v Idziak*, 484 Mich 549, 554, 568-569; 773 NW2d 616 (2009). MCL 769.11b provides when defendants are entitled to sentencing credit towards their sentences:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

Under the language of this statute, to receive sentencing credit at the time of sentencing for time spent in incarceration before conviction of an offense, a defendant must have been incarcerated for the offense of which he or she is convicted and not for an offense or circumstance unrelated to the conviction. *People v Prieskorn*, 424 Mich 327, 340-341; 381 NW2d 646 (1985). Our Supreme Court has explicitly rejected the proposition that a defendant is entitled to credit for time spent incarcerated for an offense other than the one for which he is convicted on the ground that the authorities "could have" placed a detainer upon him at an earlier time. *People v Adkins*, 433 Mich 732, 743-749; 449 NW2d 400 (1989).

From December 27, 2018 until May 13, 2019, defendant was incarcerated because he failed to furnish bond for his CCW, felon-in-possession, and felony-firearm charges—not because he failed to furnish bond for his AWIM, discharging a weapon from a vehicle, and his two related felony-firearm charges. Defendant was not actually charged with AWIM (and thus AWIGBH) until May 13, 2019. Therefore, defendant was not incarcerated for failing to furnish bond for AWIGBH until May 13, 2019. Under the plain terms of the statute, defendant was not entitled to sentencing credit for his AWIGBH sentence for the 139 days between December 27, 2018 and May 13, 2019. Defendant reasons that he is entitled to sentencing credit under MCL 769.11b because, although he was not formally charged with AWIGBH on December 27, 2018, his CCW, felon-in-possession, and felony-firearm charges were related to his AWIGBH charges. However, our Supreme Court has implicitly rejected the notion that a defendant is entitled to sentencing credit simply because the time served on one charge bears "an intimate and substantial relationship to the crime for which such person is subsequently convicted." See *Prieskorn*, 424 Mich at 340-341 (citation omitted).

Defendant generally contends that he should have been charged in both files at the same time. The Due Process Clause does have "a limited role to play" in protecting the accused against an "oppressive delay" in bringing charges. *United States v Lovasco*, 431 US 783, 789; 97 S Ct 2044; 52 L Ed 2d 752 (1977). However, a defendant must show that the government had a nefarious reason for the delay, such as to gain a tactical advantage. See *Adkins*, 433 Mich at 750;

*United States v Marion*, 404 US 307, 324; 92 S Ct 455; 30 L Ed 2d 468 (1971). A delay for the purpose of conducting an adequately thorough investigation is not improper, even if the government might have had enough evidence to prove its case earlier. *Lovasco*, 431 US at 790-792, 795-796; *Marion*, 404 US at 324-325. In the absence of any indication that the prosecutor lied, we accept the prosecutor's representation that the reason for the delay in filing some of the charges in this matter was to permit a more thorough investigation. See *People v Dunbar*, 463 Mich 606, 617 n 13; 625 NW2d 1 (2001). Defendant has not established that the prosecution violated his due process rights.

Defendant's sentence for AWIGBH is vacated, and we remand for resentencing for that offense. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Kristina Robinson Garrett